[Cite as *State v. Anderson*, 2014-Ohio-4245.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO

      Plaintiff-Appellee

v.

RICKYM ANDERSON

      Defendant-Appellant


Appellate Case No.    25689

Trial Court Case No.   2012-CR-1911/1


(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of September, 2014.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

STEPHEN A. GOLDMEIER, Atty. Reg. No. 0087553, CHARLYN BOHLAND, Atty. Reg. No. 0088080, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
     Attorneys for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1}    Defendant-Appellant, Rickym Anderson, appeals from his conviction and sentence on three counts of aggravated robbery and one count of kidnapping, with gun specifications.   Following a jury trial, Anderson was sentenced to a total of 28 years in prison.

{¶ 2}    In support of his appeal, Anderson contends that the trial court erred when it overruled his motion to suppress statements made to police and in sentencing him to a prison term that was disproportionate to that of a more culpable co-defendant who pled guilty. Anderson further contends that the trial court erred by sentencing him to consecutive sentences without complying with R.C. 2929.14, and by failing to properly calculate jail-time credit.

{¶ 3}    In addition, Anderson contends that the juvenile court erred in transferring his case to adult court, in violation of his rights under the Due Process Clause and the Equal Protection Clause, and in violation of state and federal prohibitions against cruel and unusual punishment.   Finally, Anderson contends that he was denied the effective assistance of counsel.

{¶ 4}    We conclude that the trial court did not err in overruling the motion to suppress, because the evidence at the suppression hearing supports the trial court's conclusion that Anderson knowingly, voluntarily, and intelligently waived his Miranda rights.

{¶ 5}    We further conclude that the mandatory transfer provisions for juvenile offenders in R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b) do not violate due process rights, equal protection rights, or prohibitions against cruel and unusual punishment.

{¶ 6}    However, the trial court did err by failing to comply with R.C. 2929.14(C)'s provisions for imposing consecutive sentences, and by failing to properly calculate jail-time

credit. In view of this holding, the issue of the court's alleged error in imposing a disproportionate sentence is moot, because Anderson's sentence will be vacated and the matter will be remanded for a new sentencing hearing. Finally, any alleged ineffectiveness of trial counsel did not prejudice Anderson, because all of his arguments have been considered, with the exception of his trial tax argument, which is moot, due to the vacation of the sentence. Accordingly, the judgment of the trial court will be affirmed in part and reversed in part. Anderson's sentence will be vacated, and this matter will be remanded to the trial court for a new sentencing hearing.

## I. Facts and Course of Proceedings

{¶ 7} This case arises from two separate incidents that occurred on April 20, 2012. On the morning of that day, Rickym Anderson and two high school friends, Dylan Boyd and M.H., met at the RTA hub in downtown Dayton.[1] At the time, Anderson was sixteen years old. Because the three teenagers had smoked marijuana, they were late for school. Instead of going to school, they began walking, and walked around most of the day.

{¶ 8} At around 3:00 p.m., the three teens went down an alley next to 615 Yale Avenue in Dayton, Ohio, and passed a garage with an overhead door that was partially up. At the time, Boyd was carrying a 38 caliber Smith and Wesson revolver that was black in color, with a wooden handle grip.

{¶ 9} Brian Williams and his girlfriend, Tiesha Preston, were in the garage, smoking

---

[1] The full names of Anderson and Boyd are being used because they were bound over for trial as adults. Initials are being used for the third teenager, as there is no indication in the record that he was tried as an adult.

marijuana and talking. Almost immediately after Williams saw the three people walk by the door, Boyd came back. Boyd said, "Don't move," and when Williams tried to run out the back door of the garage, Boyd opened fire. Boyd fired one bullet, which hit Williams in the back and exited through his abdomen.

{¶ 10} Williams ran across the street to a neighbor's house. When he got to the porch, he could see Boyd gesturing for Preston to get into the trunk of a gray Impala automobile that was parked in the driveway at 615 Yale. The keys to the Impala had been left on the trunk of another car that was sitting in the garage. However, the trunk of the Impala could be opened by using a release button located inside the Impala.

{¶ 11} The first neighbors that Williams approached shut the door and refused to help him, but Williams was eventually able to get help from a neighbor up the street. That neighbor took Williams to the hospital, where surgeons removed major parts of his small and large intestines. At the time of the trial, which was held nearly a year after the incident, Williams was still wearing a colostomy bag.

{¶ 12} After shooting Williams, Boyd first asked Preston where the keys to the Impala were. When she said she did not know, he told M.H. to search the Impala. When M.H. could not find the keys, Boyd told Anderson to search. Boyd also told Anderson and M.H. to get whatever they could find. Boyd then said to Preston, "Bitch, come on. Get in the trunk." Transcript of Proceedings, Volume II, p. 288. After Preston got into the trunk, she could hear the teenagers rummaging around in the car, and also heard Boyd tell the others to grab her purse. After about 25 to 30 minutes, Preston heard neighbors talking, and began beating on the trunk. She was then released from the trunk.

{¶ 13}   Following the robbery at 615 Yale, Boyd, Anderson, and M.H. went to an abandoned house on Windsor Avenue, which was about a block and a half away from where Williams had been shot.  There was no money in Preston's purse; instead, the purse contained only credit cards, identification, a food stamp card, and some cigarettes.

{¶ 14}   After smoking the cigarettes, they left the purse in the abandoned house.  M.H. then went home, and Boyd and Anderson continued walking.  After meeting another high school student, the three teenagers saw a young woman (Star MacGowan) at an apartment building taking out her trash.  At that point, Anderson was carrying the gun.  Anderson asked MacGowan if she had any money, and threatened her.  He told her he was going to "pop her." Transcript of Proceedings, Volume II, p. 351.  MacGowan handed over her purse, which contained a lime-green cell phone.

{¶ 15}   Just then, another resident of the apartment building came by and heard MacGowan yelling that her purse had been taken.  Anderson took the phone out of the purse, dropped the purse, and ran off.   The three teenagers ran in different directions.

{¶ 16}   The police were called, and were given a description of the three suspects, including their race, type of clothing, weight, and height.  Shortly thereafter, Dayton Police Officer, Jeff Hieber, saw Boyd and Anderson walking in the vicinity, wearing clothing that matched the descriptions he had been given.  After slowing down to get a better look, Hieber turned his car around and made a left onto Yale Avenue, where the suspects had been heading. When Hieber caught up to Boyd and Anderson, he detained them and  ultimately patted them down.   Hieber found a lime-green cell phone in Anderson's pocket, and the police subsequently located a gun about 30 to 40 feet away from where Boyd and Anderson were apprehended.

None of the witnesses were able to identify Anderson from a photo spread, but they all later identified him at trial.

{¶ 17}   Both Boyd and Anderson were detained and were questioned that night by the police.   After waiving his *Miranda* rights, Anderson admitted to his involvement in both robberies, and led police to the abandoned house where Preston's purse had been hidden.

{¶ 18}   Anderson was initially charged in juvenile court, but he was subsequently bound over to the general division of the common pleas court for trial as an adult.   Anderson was indicted on three counts of aggravated robbery, one count of kidnapping, and one count of felonious assault, with gun specifications for each charge.   Following a jury trial, he was found guilty of all charges, other than the felonious assault charge, which pertained to the shooting of Williams.   As was noted, the court sentenced Anderson to a total of 28 years in prison.   Williams' co-defendant, Boyd, had previously pled guilty, and had received a nine-year prison sentence.

II.   Did the Trial Court Err in Overruling the Motion to Suppress?

{¶ 19}   Anderson's First Assignment of Error states as follows:

The Trial Court Erred When It Overruled Rickym Anderson's Motion to Suppress His Statements, in Violation of the Fifth And Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution (October 23, 2012 Decision, Order and Entry Overruling Defendant Anderson's Motion to Suppress, p. 6).

{¶ 20}   Under this assignment of error, Anderson presents two main arguments.   The

first is that the State failed to prove that he intelligently and knowingly waived his constitutional rights. Anderson's second argument is that the use of deceptive interrogation techniques undermines a vulnerable child's voluntary waiver of rights. We will address each matter separately.

A. Intelligent and Voluntary Wavier of Rights

{¶ 21} In arguing that Anderson's waiver of rights was neither intelligent nor voluntary, Anderson focuses on the fact that he was treated in the same manner as an adult, without recognition of his individual circumstances or of current research and precedent, which indicate that children need greater protection than adults.

{¶ 22} Before addressing these points, we note that the standards for reviewing decisions on motions to suppress are well established. In ruling on motions to suppress, a trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994), citing *State v. Clay*, 34 Ohio St.2d 250, 298 N.E.2d 137 (1973). Consequently, when we review suppression decisions, "we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.* at 592.

{¶ 23} "The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee that no person in any criminal case shall be compelled to

be a witness against himself. The concern that animated the framers to adopt the Fifth Amendment was that coerced confessions are inherently untrustworthy." *State v. Jackson*, 2d Dist. Greene No. 02CA0001, 2002-Ohio-4680, ¶ 19, citing *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). "A suspect may waive his constitutional right against self-incrimination, provided that waiver is voluntary. A suspect's decision to waive his privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." *Id.* at ¶ 20, citing *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). (Other citation omitted.)

**{¶ 24}** We also noted in *Jackson* that:

The issues of whether a confession is voluntary, and whether a suspect has been subjected to custodial interrogation so as to require *Miranda* warnings, are analytically separate issues. The due process clause continues to require an inquiry, separate from custody considerations, concerning whether a defendant's will was overborne by the circumstances surrounding the giving of his confession.

This due process test takes into consideration the totality of all the surrounding facts and circumstances, including the characteristics of the accused and the details of the interrogation. Factors to be considered include the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threats or inducements. *State v. Edwards* (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051.

(Citations omitted.)  *Jackson* at ¶ 21.

{¶ 25}    In rejecting the motion to suppress, the trial court found no evidence of police coercion and no evidence that the police made promises or guarantees to Anderson.  The court also noted that Anderson did not ask for his parents to be present, was not a "young" juvenile, and was subject to a relatively short interview.

{¶ 26}    After reviewing the record, we agree with the trial court.  At the time of the interrogation, Anderson was 16 years old, and had prior experience with the criminal justice system.  Consistent with the dictates of *Miranda*, the police explained each right to him and confirmed that he understood his rights.  The questioning took place over a period of less than two hours, with one interview lasting about 20 to 30 minutes and the other lasting about a half hour.  Although the police did not offer Anderson food or water, or a restroom break, they would have let him take a break if he had asked.

{¶ 27}    It is true that the police did not call Anderson's parents before speaking with him.  However, "the law in Ohio does not require that a juvenile's parent or legal custodian be present during a custodial interrogation."  *State v. Kimmie*, 8th Dist. Cuyahoga No. 99236, 2013-Ohio-4034, ¶ 58.  "The presence of a parent or custodian during a juvenile's interrogation, therefore, is only one factor to consider in determining whether, under the totality of the circumstances surrounding the juvenile's statements, there is a valid waiver of the juvenile suspect's *Miranda* rights." (Citations omitted.)  *Id.*

{¶ 28}    In arguing that the trial court erred by failing to treat him differently from an adult, Anderson points to recent cases from the United States Supreme Court, which recognize that children are not adults and should not be treated as such.  For example, in *Roper v.*

*Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the Supreme Court of the United States reconsidered its prior authority, and held that the Eighth Amendment requires rejection of the imposition of the death penalty on juvenile offenders under the age of 18. *Id.* at 568. To analyze the issue, the court first conducted "a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question." *Id*. at 564. The court then decided, by exercising its "own independent judgment, whether the death penalty is a disproportionate punishment for juveniles." *Id.*

{¶ 29} In finding that the death penalty was a disproportionate penalty, the court relied, among other things, on three general differences between juveniles and adults. These included the fact that " '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' " *Id.* at 569, quoting *Johnson v. Texas*, 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993). The court further noted that "[t]he second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.*, citing *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

{¶ 30} Finally, the court observed that "[t]he third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id.* at 570, citing E. Erikson, *Identity: Youth and Crisis* (1968). With regard to the three general differences, the court stressed that:

These differences render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and

irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." *Thompson [v. Oklahoma]*, *supra*, [487 U.S. 815] at 835, 108 S.Ct. 2687 [,101 L.Ed.2d 702 (1988)] (plurality opinion). Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Johnson, supra*, at 368, 113 S.Ct. 2658 * * *.

(Citation omitted.) *Roper*, 543 U.S. at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1.

{¶ 31} Subsequently, in *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011,176 L.Ed.2d 825 (2010), the Supreme Court held that "for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole." *Id.* at 74. And, in another decision cited by Anderson, the United States Supreme Court recently held that "a child's age properly informs the *Miranda* custody analysis." *J.D.B. v. North Carolina*, ___ U.S. ___, 131 S.Ct. 2394, 2399, 180 L.Ed.2d 310 (2011).

{¶ 32} In *J.D.B.*, the minor was 13 years old, and was interrogated by police at his school. He was not given *Miranda* warnings, and confessed to crimes for which he was subsequently adjudicated delinquent. *Id.* at 2399-2400. The Supreme Court concluded that "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test." *Id.* at 2406. In reaching this conclusion, the court stressed the distinctions between children and adults, including that "children 'generally are less mature and responsible than adults,' * * *; that they 'often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them' * * *; that they 'are more vulnerable or susceptible to ... outside pressures' than adults * * *; and so on." (Citations omitted.) *Id.* at 2403.

{¶ 33} The Supreme Court declined to consider, however,
whether additional procedural *Miranda* warning
safeguards are needed for juveniles. In this regard,
the court stated that:

*Amici* on behalf of J.D.B. question whether children of all ages can comprehend *Miranda* warnings and suggest that additional procedural safeguards may be necessary to protect their *Miranda* rights. Brief for Juvenile Law Center et al. as *Amici Curiae* 13-14, n. 7. Whatever the merit of that contention, it has no relevance here, where no *Miranda* warnings were administered at all.

*J.D.B.* at 2401, fn. 4.

{¶ 34} In the final Supreme Court case cited by Anderson, the court invalidated

mandatory sentencing schemes that require children convicted of homicide to "receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes * * *." *Miller v. Alabama*, ___ U.S. ___, 132 S.Ct. 2455, 2475, 183 L.Ed.2d 407 (2012). In *Miller*, the court noted its prior observations in *Roper* and *Graham* about studies pertaining to adolescents and the " 'fundamental differences between juvenile and adult minds.' " *Id.* at 2464, citing *Roper*, 543 U.S. at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1, and quoting *Graham*, 560 U.S. at 68, 130 S.Ct. 2011,176 L.Ed.2d 825. In this regard, the court also stressed that :

> The evidence presented to us in these cases indicates that the science and social science supporting *Roper 's* and *Graham 's* conclusions have become even stronger. *See, e.g.*, Brief for American Psychological Association et al. as *Amici Curiae* 3 ("[A]n ever-growing body of research in developmental psychology and neuroscience continues to confirm and strengthen the Court's conclusions"); *id.*, at 4 ("It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance"); Brief for J. Lawrence Aber et al. as *Amici Curiae* 12-28 (discussing post- Graham studies) * * *.

*Miller* at 2465, fn. 5.

{¶ 35} In view of these indications from the Supreme Court of the United States, and studies which reveal that many juveniles do not fully understand their rights or the alternatives, Anderson argues that relying on adult presentation of rights and waiver forms does not adequately protect minors.

**{¶ 36}**    In a decision issued after *J.D.B.*, a lower court concluded that it would take the defendant's age (13) into account as a "non-determinative" factor in deciding whether police tactics used in an interrogation were such that the defendant's "free will was overborne at the time he confessed."  *In re Michael S.*, Cal. Ct. App. 2d Dist., Div.7, 2012 WL 3091576, *7. However, after considering the facts, the court in that case found the confession voluntary.[2]

**{¶ 37}**    Nonetheless, even before *J.D.B.* was decided, Ohio courts included age as a factor that must be considered in deciding whether, under the totality of the circumstances, a defendant's confession is voluntary.  *Jackson*, 2d Dist. Greene No. 02CA0001, 2002-Ohio-4680, at ¶ 21.   When the trial court in the case before us ruled on the motion to suppress, it did, in fact, consider Anderson's age, by noting that Anderson was not a young minor.

**{¶ 38}**    Furthermore, the Supreme Court of Ohio has recently rejected the argument that juveniles have a statutory right to counsel at interrogations conducted prior to the filing of a juvenile complaint.  *See In re M.W.*, 133 Ohio St.3d 309, 2012-Ohio-4538, 978 N.E.2d 164, ¶ 2.  The dissent in *M.W.* strongly disagreed, arguing that "[t]he custodial interrogation is at least as important as the events that subsequently unfold in court, and given its repercussions, a child must be afforded the right to counsel and parents during that period."  *Id.* at ¶ 69, fn. 6 (O'Connor, C.J., dissenting).   Nonetheless, the view that "juveniles are entitled to special protections because of the limitations on their cognitive abilities and legal capacity" "failed to garner majority support [in *M.W.*], and we are compelled to follow the dictates of the majority." *In re T.J.*, 6th Dist. Lucas No. L-12-1347, 2013-Ohio-3057, ¶ 10 (rejecting the argument that a

---

[2]     The cited case is an unpublished opinion whose citation is restricted by California Rules of Court.    We cite it not for the fact that age should or must be considered, but only to note that *J.D.B.* has been applied in this manner.

minor was entitled to have a parent or attorney present before he could waive his *Miranda* rights).[3]

**{¶ 39}** Accordingly, we cannot conclude that Anderson's rights were infringed by the failure to provide additional safeguards prior to the wavier of his *Miranda* rights. Anderson received all the protection he is currently due under Ohio law.

## B. Deceptive Interrogation Techniques

**{¶ 40}** Anderson's second major issue concerning voluntary waiver involves deceptive interrogation techniques. As was noted, the interrogating detectives falsely told Anderson that he had been identified by witnesses. Anderson contends that a child's ability to understand and resist manipulative tactics is hampered by youthfulness, and that the International Association of Chiefs of Police, in fact, discourages use of deceptive interrogation tactics with children.

**{¶ 41}** "Deception is a factor bearing on voluntariness, but, standing alone, does not establish coercion * * *." *State Singleton*, 2d Dist. Montgomery Nos. 17003, 17004, 1999 WL

---

[3] Some jurisdictions do provide *Miranda* warnings tailored to juveniles. For example, *Hall v. Thomas*, 623 F.Supp.2d 1302 (M.D.Ala. 2009), noted that: "Alabama law guarantees additional rights for juveniles subject to interrogation, and requires the police to read additional warnings, sometimes referred to as 'Super *Miranda*' warnings. Rule 11(B) of the Alabama Rules of Juvenile Procedure, which was effective at the time of Hall's arrest, lists the '[r]ights of a child before being questioned while in custody.' The interrogator must inform a juvenile of these rights before questioning him on 'anything concerning the charge' for which he was arrested. *Id.* They include 'the right to communicate' with the child's counsel, parent, or guardian and if he or she is not present, 'if necessary, reasonable means will be provided for the child to do so.' *Id.*" *Hall* at 1307, fn. 3. Similarly, Indiana provides additional protections for minors. *See J.L. v. State*, 5 N.E.3d 431, 437 (Ind.App. 2014) (discussing juvenile *Miranda* form, and the requirement that juveniles and parents be allowed to confer prior to waiver of rights). Ohio has not yet chosen to adopt these additional protections.

173357, *4 (March 31, 1999), citing *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1999). (Other citations omitted.) *See, also*, *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 17.

{¶ 42} Anderson does not suggest, and we have not found, Ohio authority condemning deceptive interrogation techniques in situations involving children. In Ohio, as in other jurisdictions, deception in interrogation is only one factor in assessing voluntariness. For example in *State v. Jackson*, 333 Wis.2d 665, 2011 WI App 63, 799 N.W.2d 461, the defendant was 15 years old, had an IQ of 73, and was charged with attempted first degree intentional homicide. *Id.* at ¶ 1 and 21. The defendant claimed his confession was involuntary due to his IQ and age, as well as the fact that the police had lied to him. *Id.* at ¶ 21. However, the court of appeals disagreed, noting that:

> The State responds that, while it may not have been true that multiple people had identified Jackson in a lineup, one person had. And misrepresentation or trickery does not make an otherwise voluntary statement involuntary – it is only one factor to consider in the totality of the circumstances. *State v. Ward*, 2009 WI 60, ¶ 27, 318 Wis.2d 301, 767 N.W.2d 236. As we explained in *State v. Triggs*, 2003 WI App 91, ¶ 19, 264 Wis.2d 861, 663 N.W.2d 396,
>
> "Inflating evidence of [the defendant's] guilt interfered little, if at all, with his 'free and deliberate choice' of whether to confess, for it did not lead him to consider anything beyond his own beliefs regarding his actual guilt or innocence, his moral sense of right and wrong, and his judgment regarding the likelihood that the police had garnered enough valid evidence linking him to the crime."

(Citation omitted.)   *Jackson* at ¶ 22.

**{¶ 43}**   After reviewing the totality of the circumstances, we find no evidence that Anderson's waiver was involuntary.   Although Anderson was a juvenile, he was 16 and had prior experience with Miranda warnings.   Furthermore, there is no indication that Anderson was under the influence of any medication or other substance, that he had low intellectual ability, or that the police used coercive tactics.

**{¶ 44}**   Because the evidence at the suppression hearing supports the trial court's decision that Anderson knowingly, voluntarily, and intelligently waived his Miranda rights, the trial court did not err in overruling the motion to suppress.   Accordingly, Anderson's First Assignment of Error is overruled.

### III.   Did the Court Fail to Comply with R.C. 2929.14(C)?

**{¶ 45}**   For purposes of convenience, we will next address Anderson's Third Assignment of Error, which states that:

> The Trial Court Erred When It Sentenced Rickym Anderson to Consecutive Sentences without Complying with R.C. 2929.14, in Violation of His Right to Due Process as Guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

**{¶ 46}**   Under this assignment of error, Anderson contends that the trial court erred by sentencing him to consecutive sentences without complying with R.C. 2929.14.   Since Anderson failed to object to consecutive sentences at the sentencing hearing, "he has forfeited all but plain error."   *State v. Jones*, 10th Dist. Franklin No. 14AP-80, 2014-Ohio-3740, ¶ 11, citing Crim.R.

52(B). (Other citation omitted.) "Under Crim.R. 52(B), '[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.' 'To constitute plain error, the error must be obvious on the record, palpable, and fundamental such that it should have been apparent to the trial court without objection.' " *Jones* at ¶ 11, quoting *State v. Gullick*, 10th Dist. Franklin No. 13AP-26, 2013-Ohio-3342, ¶ 3. (Other citation omitted.)

**{¶ 47}** With regard to consecutive sentences, R.C. 2929.14(C)(4) states that:

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately

reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶ 48}** In a recent decision, the Supreme Court of Ohio held that "[i]n order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, ___ Ohio St.3d ___, 2014-Ohio-3177, ___ N.E.2d ___, syllabus.

**{¶ 49}** In *Bonnell*, the trial court imposed consecutive sentences, and mentioned the defendant's "atrocious" record, his lengthy prison record, the fact that up to that point, the defendant had shown very little respect for society and its rules, and the fact that the courts had given the defendant opportunities. *Id.* at ¶ 9-10. Nonetheless, the Supreme Court of Ohio indicated that these descriptions did not allow it to conclude that the trial court had made the required findings under R.C. 2929.14(C)(4). Accordingly, the court reversed the judgment, vacated the sentence, and remanded the case for further proceedings. *Id.* at ¶ 34-37.

**{¶ 50}** In *Jones*, the Tenth District Court of Appeals also held that failure to make the findings required under R.C. 2929.14(C)(4) causes a sentence to be contrary to law and constitutes plain error. *Jones*, 10th Dist. Franklin No. 14AP-80, 2014-Ohio-3740, at ¶ 18.

**{¶ 51}** In view of this authority, Anderson's sentence is contrary to law under R.C. 2929.14(C)(4), and will be vacated and remanded for further proceedings. Accordingly, the Third Assignment of Error is sustained. Anderson's sentence will be vacated, and this matter

will be remanded to the trial court for a new sentencing hearing.

### IV. Was the Sentence Disproportionate to that of a Co-Defendant?

{¶ 52}    Anderson's Second Assignment of Error states that:

The Trial Court Erred When it Sentenced Rickym Anderson, after a Jury Trial, to a Prison Term Disproportionate to that of a More Culpable CoDefendant Who Pleaded Guilty, in Violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution (2/20/2013 T. p. 583; February 22, 2013 Judgment Entry of Sentence).

{¶ 53}    Under this assignment of error, Anderson contends that he was sentenced to a significantly longer sentence than his co-defendant, Dylan Boyd, who received only a nine-year sentence for more culpable acts.    Boyd was involved in both robberies, and was the shooter who caused serious physical harm to Brian Williams.    After pleading guilty,  Boyd was sentenced to nine years in prison, whereas Anderson received a total of 28 years in prison following a jury trial.   Anderson contends that this amounted to a "trial tax" under our prior decision in *State v. Beverly*, 2d Dist. Clark No. 2011 CA 64, 2013-Ohio-1365.

{¶ 54}    We need not address this matter, however, because Anderson's sentence is being vacated, and this matter is being remanded for a new sentencing hearing.   Accordingly, the Second Assignment of Error is overruled, as moot.

### V. Did the Trial Court Fail to Grant Proper Jail Time Credit?

**{¶ 55}** Anderson's Fourth Assignment of Error states as follows:

The Trial Court Erred When It Granted Rickym Anderson Only 240 days of Jail-time Credit, in Violation of His Right to Equal Protection as Guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

**{¶ 56}** Under this assignment of error, Anderson contends that the trial court erred by failing to grant him 67 days of additional jail-time credit for the time that he was confined by order of the juvenile court. The trial court credited Anderson with 240 days of jail-time credit, dating from the time of the indictment. According to Anderson's calculations, he was instead confined for 307 days.

**{¶ 57}** The State does not dispute the applicability of jail-time credit to confinement in a juvenile detention facility; instead, the State's position is that it is not clear from the record where Anderson served detention or whether he was able to leave. Both sides also agree that a plain error analysis applies, because Anderson failed to raise this issue in the trial court.

**{¶ 58}** As was noted, " 'To constitute plain error, the error must be obvious on the record, palpable, and fundamental such that it should have been apparent to the trial court without objection.' " (Citations omitted.) *Jones*, 10th Dist. Franklin No. 14AP-80, 2014-Ohio-3740, at ¶ 11.

**{¶ 59}** We have previously stressed that "[w]here, for whatever reason, a defendant remains in jail prior to his trial, he must be given credit on the sentence ultimately imposed for all periods of actual confinement on that charge." (Citations omitted*.) State v. Angi*, 2d Dist. Greene No. 2011 CA 72, 2012-Ohio-3840, ¶ 7. Furthermore, " '[a]lthough the [department of

rehabilitation and correction] has a mandatory duty pursuant to R.C. 2967.191 to credit an inmate with the jail time already served, it is the trial court that makes the factual determination as to the number of days of confinement that a defendant is entitled to have credited toward his sentence.' " *State v. Coyle*, 2d Dist. Montgomery No. 23450, 2010-Ohio-2130, ¶ 7, quoting *State ex rel. Rankin v. Ohio Adult Parole Auth.*, 98 Ohio St.3d 476, 2003-Ohio-2061, 786 N.E.2d 1286, ¶ 7. We also note that R.C. 2967.191 specifically includes confinement in a juvenile facility within the jail-time credit statute.

{¶ 60} The record is clear that Anderson was confined from the time he was initially arrested in April 2012. The juvenile court record is part of the file, and indicates that Anderson was remanded to detention on April 21, 2012 (the day after his arrest), based on the juvenile court's finding that his continued residence in his home would be contrary to his best interests, and that detention was required under Juv.R. 7 due to the charges. The trial court file contains no indication that Anderson was allowed to leave juvenile detention for any reason. In fact, the record indicates otherwise, as Anderson was served at the Montgomery County Jail on June 18, 2012, with the juvenile court's entry and order granting the State's motion to relinquish jurisdiction. The indictment was not filed until around three weeks later, on July 5, 2012. Consequently, Anderson was clearly confined in jail or in a juvenile facility prior to the date of the indictment. Due to the error that is apparent on the face of the record, this case must be remanded for examination of proper jail time credit.

{¶ 61} Accordingly, Anderson's Fourth Assignment of Error is sustained.

VI.   Does Mandatory Bindover Violate Various Constitutional Rights?

**{¶ 62}** Anderson's Fifth, Sixth, and Seventh Assignments of Error deal with related issues, and will be discussed together. Anderson's Fifth Assignment of Error states that:

> The Juvenile Court Erred When It Transferred Rickym Anderson's Case to Adult Court Because the Mandatory Transfer Provisions in R.C. 2152.10(A)(2)(b) and R.C. 2152.12(A)(1)(b) Violate a Child's Right to Due Process as Guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution. (June [1]8, 2012 Entry and Order Finding Probable Cause and Granting Motion to Relinquish Jurisdiction and Transfer to General Division, pp. 1-2).

**{¶ 63}** The Sixth and Seventh Assignments of Error are identical to the Fifth Assignment of Error, except that they raise violations of the Equal Protection Clause and of prohibitions against cruel and unusual punishment.

**{¶ 64}** Under these assignments of error, Anderson contends that R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b) are unconstitutional because they prohibit juvenile courts from making any individualized decision about the appropriateness of transferring particular cases to adult court. Before addressing Anderson's arguments, we note that Anderson failed to raise constitutionality in the trial court.

**{¶ 65}** "Failure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue." *State v. Awan*, 22 Ohio St.3d 120, 489 N.E.2d 277 (1986), syllabus. However, the Supreme Court of Ohio later clarified that "[t]he waiver doctrine * * * is discretionary." *In re M.D.*, 38 Ohio St.3d 149, 527 N.E.2d 286 (1988), syllabus. Thus, "[e]ven where wavier is clear,

[appellate courts may] consider constitutional challenges to the application of statutes in specific cases of plain error or where the rights and interests involved may warrant it." *Id.* In our discretion, we will consider the assignments of error pertaining to the constitutionality of mandatory bindover.

A.   Due Process

**{¶ 66}**   R.C. 2152.10(A)(2)(b) and R.C. 2152.12(A)(1)(b) require mandatory transfer of a case to adult court where: a child is charged with a category two offense; the child is sixteen years of age or older at the time of the act charged; the child is alleged to have committed the offense with a firearm; and there is probable cause to believe the juvenile committed the act that has been charged.

**{¶ 67}**   Anderson contends that mandatory transfer and Ohio's failure to provide for an amenability hearing violate the due process holding in *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), which outlined eight factors to be considered in transfer proceedings before a juvenile court orders bindover.   However, other appellate districts have rejected this argument, based on the fact that *Kent* involved discretionary, rather than mandatory transfer.   *See   State v. Lane*, 11th Dist. Geauga No. 2013-G-3144, 2014-Ohio-2010, ¶ 57, citing *State v. Kelly*, 3d Dist. Union No. 14-98-26, 1998 WL 812238, *19-20 (Nov. 18, 1998).   Thus, "because the *Kent* factors were intended to address the problem of arbitrary decision-making and disparate treatment in discretionary bindover determinations, due process does not require use of these factors when the legislature has statutorily eliminated discretionary bindover determinations." *Id.*

{¶ 68}    In addition, we have previously held that mandatory bindover does not violate due process.  *State v. Agee*, 133 Ohio App.3d 441, 448-449, 728 N.E.2d 442 (2d Dist.1999), citing *State v. Ramey*, 2d Dist. Montgomery No. 16442, 1998 WL 310741 (May 22, 1998).   In this regard, we reasoned in *Ramey* that "[b]ecause amenability to treatment as a juvenile is not an issue determinative of transfer when the juvenile court finds that the underlying offense is one that [the statute] defines as an offense of violence, the juvenile is not thereafter entitled to a hearing to determine his amenability to treatment. Thus, no due process violation is demonstrated by the lack of an 'amenability' hearing * * *."   *Ramey* at *1.

{¶ 69}    Recently, we stressed that we will continue to follow this precedent until the Supreme Court of Ohio advises otherwise.  See *State v. Brookshire*, 2d Dist. Montgomery No. 25853, 2014-Ohio-1971, ¶ 30.

{¶ 70}    Accordingly, we reject the argument that the mandatory transfer statutes violate due process.


B.   Equal Protection

{¶ 71}    Anderson also contends that R.C. 2152.10 and 2152.12 violate the Equal Protection Clause because: (1) they create classes of similarly situated children, based solely on age; and (2) the age-based distinctions in these statutes are not rationally related to the purpose of juvenile delinquency proceedings.  In *Ramey*, we addressed and rejected an equal protection challenge to R.C. 2151.26, which was the predecessor statute to R.C. 2152.12.  Specifically, we noted that:

R.C. 2151.26 classifies juveniles whose delinquent acts could constitute a

felony offense of violence if committed by an adult differently than it treats those whose acts would not constitute a felony offense of violence if committed by an adult. That class distinction bears a reasonable relationship to a legitimate governmental objective, which is to punish violent juvenile offenders more harshly by denying them the prospect of more lenient treatment in the juvenile system. Such distinctions may be made between different types of offenders, adult or juvenile, without denying persons involved the equal protection of law.

*Ramey* at *3.

{¶ 72} The classification we considered in *Ramey* is somewhat different than the classification being challenged in the case before us. Specifically, Anderson argues that transfer is mandatory for those 16 or older, is discretionary for offenders who are 14 or 15 years of age, and is not permitted for offenders who are less than fourteen years of age. According to Anderson, this bright-line, age-based classification is not rationally related to the State's legitimate objectives.

{¶ 73} In *Lane*, the Eleventh District Court of Appeals noted that "[t]he standard for determining if a statute violates equal protection is 'essentially the same under state and federal law.' " *Lane,* 11th Dist. Geauga No. 2013-G-3144, 2014-Ohio-2010, at ¶ 64, quoting *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 353, 639 N.E.2d 31 (1994). " 'Under a traditional equal protection analysis, class distinctions in legislation are permissible if they bear some rational relationship to a legitimate governmental objective.' " *Id.*, quoting *State ex rel. Vana v. Maple Hts. City Council*, 54 Ohio St.3d 91, 92, 561 N.E.2d 909 (1990).

{¶ 74} As here, the defendant in *Lane* contended that disparate treatment based on age

was not supported by scientific evidence. *Lane* at ¶ 66. However, the court of appeals rejected that argument because the defendant had failed to meet his burden of proving beyond doubt that the statutes were unconstitutional. *Id.*

**{¶ 75}** The same observation may be made in the case before us. Although Anderson contends that there is little difference between children who are younger than 16 and those who are older than 16, he does not support this contention with any type of empirical evidence. In the absence of such evidence, we cannot find that the distinction the legislature made is unconnected to its aims. As the court in *Lane* observed, "the purpose of this legislation is to protect society and reduce violent crime by juveniles. * * * Contrary to appellant's argument, juveniles who are 14 or 15 are markedly different from those who are 16 or 17 in many ways, *e.g.*, in terms of physical development and maturity. * * * Thus, the legislature's decision to single out older juvenile homicide offenders, who are potentially more street-wise, hardened, dangerous, and violent, is rationally related to this legitimate governmental purpose." (Citation omitted.) (Italics added.) *Id.* at ¶ 67.

**{¶ 76}** Based on the preceding discussion, Anderson's equal protection argument is without merit.

### C. Cruel and Unusual Punishment

**{¶ 77}** Anderson's final argument in this context is that Ohio's mandatory bindover statutes violate state and federal prohibitions against cruel and unusual punishment. According to Anderson, evolving standards in the past decade militate against prosecuting youthful offenders in adult court.

{¶ 78}    Recently, the Supreme Court of Ohio observed that "this court has recognized that cases involving cruel and unusual punishments are rare, 'limited to those involving sanctions which under the circumstances would be considered shocking to any reasonable person.' " *In re C.P.*, 131 Ohio St.3d 513, 2012-Ohio-1446, 967 N.E.2d 729, ¶ 60, quoting *McDougle v. Maxwell*, 1 Ohio St.2d 68, 70, 203 N.E.2d 334 (1964).    The court further emphasized that " '[a] punishment does not violate the constitutional prohibition against cruel and unusual punishments, if it be not so greatly disproportionate to the offense as to shock the sense of justice of the community.' " *Id.*, quoting *State v. Chaffin*, 30 Ohio St.2d 13, 282 N.E.2d 46 (1972), paragraph three of the syllabus.

{¶ 79}    When presented with this issue, the Eleventh District Court of Appeals concluded in *Lane* that mandatory bindover does not fit within the definition of a "punishment," and that the prohibition against cruel and unusual punishment would not apply.    *Lane*, 11th Dist. Geauga No. 2013-G-3144, 2014-Ohio-2010, at ¶ 73.    In this regard, the court of appeals also noted that " '[m]andatory bindover does not equate to punishment any more than the mere prosecution of an adult in the common pleas court constitutes punishment.' " *Id.*, quoting *State v. Quarterman*, 9th Dist. Summit No. 26400, 2013-Ohio-3606, ¶ 16 (Carr, J., concurring).[4]

{¶ 80}    We agree with these comments, and hold that R.C. 2152.10 and R.C. 2152.12 do not violate prohibitions against cruel and unusual punishment.

---

[4]    The Supreme Court of Ohio recently issued a decision in *Quarterman*.    *See State v. Quarterman*, Slip Opinion No. 2014-Ohio-4034.    After accepting the case for review, the court declined to reach the merits of Quarterman's constitutional claim pertaining to mandatory bindover.    The court held that Quarterman had forfeited all but plain error by failing to assert his constitutional challenge in either juvenile or common pleas court, and had also failed to properly address the application of the plain error rule during his appeal to the Supreme Court of Ohio.    *Id.* at ¶ 2.    Accordingly, the court affirmed the judgment of the court of appeals.    *Id.* at ¶ 3.

**{¶ 81}** Based on the preceding discussion, Anderson's Fifth, Sixth, and Seventh Assignments of Error are overruled.

### VII. Was Anderson's Trial Counsel Ineffective?

**{¶ 82}** Anderson's Eighth Assignment of Error states that:

Rickym Anderson Was Denied the Effective Assistance of Counsel. Sixth and Fourteenth Amendments to the United States Constitution; Section 10, Article I of the Ohio Constitution. (June [1]8, 2012 Entry and Order Finding Probable Cause and Granting Motion to Relinquish Jurisdiction and Transfer to General Division, pp. 1-2).

**{¶ 83}** Under this assignment of error, Anderson contends that his trial counsel was ineffective in several ways: (1) by failing to object to the constitutionality of his transfer to adult court; (2) by failing to object to the trial court's imposition of a "trial tax"; (3) by failing to object to the court's imposition of consecutive sentences without proper findings; and (4) by failing to object to the trial court's grant of jail-time credit.

**{¶ 84}** "In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance, and to show deficiency, the defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness." *State v. Matthews,* 189 Ohio App.3d 446, 2010-Ohio-4153, 938 N.E.2d 1099, ¶ 39 (2d Dist.).

**{¶ 85}** After reviewing the record, we conclude that even if trial counsel was ineffective, Anderson has not been prejudiced. Although trial counsel failed to raise the above issues with the trial court, we have considered all the arguments raised by Anderson on appeal, other than the issue of the "trial tax," which is moot due to the vacation of Anderson's sentence. Anderson will be able to raise the "trial tax" issue in a subsequent appeal, should the trial court again impose a sentence that Anderson deems disproportionate.

**{¶ 86}** In light of the preceding discussion, the Eighth Assignment of Error is overruled.


VIII.  Conclusion

**{¶ 87}** The First, Fifth, Sixth, Seventh, and Eighth Assignments of Error are overruled; the Second Assignment of Error is overruled as moot, and the Third and Fourth    Assignments of Error are sustained. Accordingly, the judgment of the trial court is affirmed in part and reversed in part. The sentence of Defendant-Appellant, Rickym Anderson, is vacated, and this matter is remanded for a new sentencing hearing.


. . . . . . . . . . . .

FROELICH, P.J., and HALL, J., concur.



Copies mailed to:

Mathias H. Heck
Kirsten A. Brandt

Stephen A. Goldmeier
Charlyn Bohland
Hon. Barbara P. Gorman